## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| GERARD COCHARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:18-CV-00301-MSM-LDA |
| | ) | |
| ROEHM PRODUCTS OF AMERICA, | ) | |
| INC. alias RÖHM PRODUCTS OF | ) | |
| AMERICA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DECISION AND ORDER

Mary S. McElroy, United States District Judge.

The plaintiff, Gerard Cochard, decided to leave his employer of 25 years, Roehm Products of America, Inc. ("Roehm"), to work for a competitor. Roehm, however, claimed to Mr. Cochard that he was precluded from doing so because of a noncompetition agreement. So, Mr. Cochard filed this lawsuit primarily to seek a declaration that he was not bound by any such contract. As it turned out, no such contract was in effect and the Court granted Mr. Cochard's motion for partial summary judgment on that issue. What largely remained thereafter was Roehm's extensive list of counterclaims alleging misconduct on the part of Mr. Cochard, the thrust of which was his alleged misappropriation of Roehm's trade secrets.

The parties conducted a jury-waived trial before the Court on the remaining claims and counterclaims from May 16 to May 19, 2022. Having considered the evidence presented at trial and the post-trial memoranda submitted by the parties,

1

the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

## I.      FINDINGS OF FACT

Roehm, headquartered in the Atlanta, Georgia, area, is the American subsidiary of Röhm GmbH ("Röhm"), a German company.  Tr. III at 112.  Roehm provides complex work holding devices, including chucks, vises, collet chucks, and mandrels.  Tr. I at 25.  A chuck is a device that is used on a rotational machine such as a lathe to hold a work piece with jaws.  *Id.*  A collet chuck is similar to a chuck, except that it includes a collet which affects a 360 degree hold on a work piece.  *Id.*  A mandrel differs from a chuck in that it expands to hold a work piece from a point internal to the work piece.  *Id.* at 27.  Chucks, collet chucks, and mandrels contain complex assemblies of internal components.  *Id.*  They are active through manipulation of a lever or gear, or by electric, pneumatic, or hydraulic power.  Tr. III at 118-19.

Roehm maintains a catalogue depicting an extensive range of these items but also specially designs and manufactures devices for a customer's specific application. Tr. I at 28, 79.  Specially made chucks are the product of specific designs for complex work pieces or complex manufacturing processes that require a customized solution. *Id.* at 28.  Specially made chucks, collet chucks, and mandrels make up 60% of the products that Roehm sells.  Tr. II at 122.

Röhm creates and maintains its product designs in various computer aided design files.  It uses a program called AutoCAD to access and manipulate its

Computer Aided Drawing ("CAD") documents, typically using a filename with the digital suffix .dwg.  Tr. III at 122.  Röhm's German engineers also use a software called Solid Edge to store and access CAD files bearing the digital suffixes .dwg and .dxf. *Id.*

Röhm's CAD drawings contain technical and precise information.  When accessed with appropriate CAD software, digital CAD files provide the ability to make precise measurements within a 10,000th of a millimeter, provide the ability to determine angles between components, provide the ability to scale the product up or down, extend it, or add components from other .dwg files and bring them together, and provide the ability to meld multiple drawings together.  Tr. I at 81-82; Tr. III at 136-37.  CAD files can be transmitted either in .pdf format or in a native digital format (such as .dwg) that is accessible to users with the appropriate software.  For most customers, .pdf drawings are easier to use and access.  Tr. I at 82.  As compared to .pdf drawings, CAD files are "generally cumbersome to navigate, and if you don't have the specific software to open the drawing you can't navigate or even look at the drawing."  Tr. I at 80.

Two exhibits presented at trial govern Roehm's "documentation guideline"; that is, Roehm's policy to release free-of-charge product drawings in various formats, including PDF, CAD Exchange, DXF, and TIF.  The first, Exhibit G, is a 2013 document that sets forth Roehm's company policy to provide customers with "free, standard Röhm production documentation."  The "free, standard" documentation available to all customers specifically includes "assembly drawing[s], clamping set

3

drawing[s], [and] single component drawing[s] of the parts in contact with the workpiece." *Id.* Roehm permits these documents to be provided to customers in numerous formats, including both PDF and CAD. *Id.*

The documentation guidelines also require that the following language be printed on every sales contract:

> The documentation consists of the assembly drawing, the piece list with wear and spare parts marked, as well as installation instructions on request. Each in German and/or in English on request.
>
> The free documentation is either delivered in paper form or in digital form. If in digital form, drawings piece lists and texts are in PDF format.
>
> Any scope of documentation going beyond this will be billed separately or will require a special agreement.

*Id.*

Exhibit H is a 2018 Röhm document titled "Design data sharing to customers," which replaced the policy set forth in Exhibit G. Matthew Mayer, the former Roehm CEO,[1] however, testified that both exhibits contained "generally the same information." Tr. I at 100. The document provides that:

> When the order is placed or within the order and project handling (approval drawing documentation) the Engineering department will provide
>
> - Assembly drawings (ASS, B and attachment drawings) in PDF, TIF, DXF or DWG format
> - Parts lists
>   In PDF, XLS or TXT format
> - Single part drawings of parts in contact with the workpiece
>   In PDF, TIF, DXF or DWG format
> - 3D envelope models of Solid Edge assemblies
>
> directly to the customer.
>
> …

---

[1] Matthew Mayer served as Roehm CEO from February 2013 to July 2021, at which point he was summarily terminated. Tr. I at 24, 63.

Other design drawings (components) or 3D models (solids) are <u>not</u> passed on to customers.

If a customer should insist on more exact information, this might have to be released by the head of Engineering or the respective head of design department.   If necessary individual contracts and/or non-disclosure agreements have to be arranged.

Exhibit H.

The release of CAD drawings to customers had been a Roehm company policy since the 1990s.  Tr. II at 155-57.  Indeed, the Roehm website has a CAD landing page where certain CAD files of products can be accessed.  Tr. I at 79.

The Court finds that Exhibits G and H represent Roehm's policy for the release of product design drawings and finds incredible any contrary testimony, including from the current Roehm CEO, David Jackson, that all Roehm "drawings and especially in original editable CAD file formats" were confidential.  Tr. III at 123.

Regarding non-disclosure agreements ("NDA"), Mr. Mayer testified that about 5% of product drawings sent to customers were accompanied by such an agreement.  Tr. I at 92-93.  Further, the NDA usually was requested by the customer, who did not want the work it was doing disclosed, rather than Roehm trying to protect its own product.  *Id.*

Since 2013, Roehm's Employee Handbook has stated:

5-11 Confidential Company Information

During the course of work, an employee may become aware of Roehm Products of Americas business, including but not limited to information regarding Company finances, pricing, products, and new product development, software and computer programs, marketing strategies, suppliers and potential customers.  An employee also may become aware of similar confidential information belonging to the Company's clients.

It is extremely important that all such important information remain confidential and particularly not be disclosed to our competitors.  Any employee who improperly copies, removes (whether physically or electronically), uses or discloses confidential information to anyone outside of the Company may be subject to disciplinary action up to an including termination.   Employees may be required to sign an agreement reiterating these obligations.

Exhibit 56 at 30.

The plaintiff, Mr. Cochard, acknowledged receipt of this Handbook.  Tr. II at 112.

### Gerard Cochard's Employment with Roehm

Mr. Cochard began working for Roehm as Vice President of Sales on November 1, 1993, to sell work holding tools in the United States.  *Id.* at 74.   He started working out of his home but later opened Roehm's Warwick, Rhode Island office.  *Id.* at 102. There, he worked with a staff of three: his wife Dominique Cochard; a design engineer James Laren, and Kevin Thatcher, the Regional Sales Manager for New England.  In 2005, Röhm promoted Mr. Cochard to corporate Vice President of Roehm USA, making him the highest-ranking corporate officer of Roehm whenever the CEO position was vacant.  Tr. II at 119; Tr. III at 9.

On a "typical day," Mr. Cochard would "visit a customer, to gather information on the customer's goal, to machine a specific type of material on a specific type of machine in order to form a specific type of part or product."  Tr. III at 14.  If Mr. Cochard could find something suitable in the Roehm catalogue, he would sell that. *Id.* at 15.  Otherwise, he "would sketch something to find a solution," which he would give to the designer James Laren, who would make a CAD drawing to be presented to the customer.  *Id.*  He would then send the CAD drawings to Germany and request

a price.  *Id.*  Finally, he would get "the formal petition and everything in the system" and present the proposal to the customer.  *Id.*

Mr. Cochard became disillusioned with Roehm when, in October 2017, his friend, Patrick Froidefond, was summarily terminated from the company by its new owner, Dr. Rothenberger.  *Id.* at 19-21.  Later, in Atlanta in the fall of 2017, Mr. Cochard met with Dr. Rothenberger who demanded Mr. Cochard's commitment to the company.  *Id.* at 66.  Mr. Cochard did not give a direct answer, to which Dr. Rothenberger said something to the effect of "[w]hy don't you just pack your bags and leave right now then."  *Id.* at 66-67.

This caused Mr. Cochard to begin looking for a new job.  He was concerned he would be abruptly "tossed out" as had Mr. Froidefond. Tr. I at 65.  Mr. Cochard began conversations with a Roehm competitor, SMW Autoblok ("SMW"). Tr. III at 22.  He then informed Mr. Laren that that he wanted to resign from Roehm to work for SMW; that SMW had been after him for years; and that SMW would also offer positions to Mr. Laren and Dominique.  Exhibit 61 at 12.

At the end of February 2018, Mr. Laren testified, Mr. Cochard also told him that he wanted to harm Roehm and that he wanted to "use information that we had gathered for customers and take it with us to SMW," to "help SMW."  *Id.* at 15, 19.[2] Mr. Laren agreed to Mr. Cochard's request and began copying files from the Röhm server in Germany and placing them on a hard drive attached to his computer.  *Id.* at

---

[2] Because James Laren died prior to trial, portions of his pretrial deposition transcript were presented as his testimony.

19. Specifically, Mr. Cochard would tell Mr. Laren which product lines he was looking for and Mr. Laren would access the server in Germany and download the files. *Id.* Mr. Laren would transfer the files onto the portable hard drives attached to each of the three office computers and when they became full, he purchased another, fourth portable hard drive. *Id.* at 23, 32.

Mr. Cochard and Mr. Laren resigned from Roehm via letters dated March 6, 2018, that they sent by U.S. mail to the Atlanta headquarters. Tr. III at 27. The Roehm CEO Matthew Mayer, Mr. Cochard's direct supervisor, learned of the letters while in Detroit on March 14, 2018. Tr. I at 52-53. Mr. Cochard offered in the letter to stay on for three months to assist in the transition. Tr. III at 27. But his resignation did not sit well with Roehm. Mr. Rothenberger and the CEO in Germany, Gerhard Glanz, instructed Mr. Mayer that "we decide when his termination would be and that would be … Friday," in other words to get him out in a week. Tr. I at 69-71.

At the time of this directive, Mr. Mayer was in Detroit, but changed his flight back to Atlanta to a flight to Providence and arrived at Roehm's Warwick office on March 15, 2018. When Mr. Mayer arrived, Mr. and Mrs. Cochard were in France due to the death of his sister. Mr. Laren, however, was present. By this time, the Warwick office was disconnected from the Roehm server. Tr. I at 54. Mr. Mayer packed up the Warwick computers and external hard drives, made arrangements to shred paper files, and hired a moving company. *Id.* at 58. He returned the next day to find Mr. Laren "transferring Dominque's grandbaby pictures form her computer … [because] Dominique wanted to save her grandbaby pictures on her computer." *Id.*

at 60.  The computers, hard drives, and other office items were later picked up by a moving company and arrived, after about three weeks, to Roehm's Atlanta office.  *Id.*

Mr. Laren testified that in early March, Mr. Cochard, about a week before he left for France, directed him to turn all the copied files over to Mr. Mayer because he did not want any kind of "trouble."  Exhibit 61 at 55.  The Court finds Mr. Laren totally credible—he was honest about the scheme to copy the files, and the motivation for doing so—and thus the Court finds as a fact that he returned to Roehm all the files that he copied, and none remained in the possession of Mr. Cochard (or Mr. Laren).  Accordingly, the Court accepts as credible Mr. Cochard's own testimony that he, in the end, "decided against" the plan to retain any of Roehm's files.  Tr. III at 101.  Roehm has presented no evidence that Mr. Cochard indeed retained any of Roehm's property after he left its employ or, importantly, that he disclosed it to any third parties.  This includes the fourth external hard drive that Mr. Laren purchased, and Mr. Mayer claims he did not receive.  There is no evidence that Mr. Cochard took it after he left Roehm and if Roehm indeed does not have it, the Court presumes it is lost.

Mr. Mayer, at the direction of Dr. Rothenberger and Mr. Glanz, threatened Mr. Cochard with liquidated damages equal to an entire year's salary if he violated a purported non-competition agreement he had with Roehm.  Tr. I at 69-70.  Mr. Mayer acknowledged, however, that at the time Roehm did not have a "current contract on file."  *Id.* at 70.

Mr. Cochard requested a copy of the purported noncompetition agreement, but

Roehm refused him.  He hired counsel to obtain the document but the lawyer, too, was rebuffed.  So, Mr. Cochard filed this lawsuit seeking a declaration that he was under no restriction from accepting lawful employment with an employer of his choosing.  He also made a claim for wages and compensation that, he alleged, Roehm withheld.

It turned out that the only noncompetition agreement between Roehm and Mr. Cochard expired in 1999.  The Court thus granted Mr. Cochard's motion for partial summary judgment on that issue.

### Roehm's Purported Trade Secrets

Mr. Mayer, who was charged with directing the litigation, was told by Mr. Glanz and Dr. Rothenberger "to pursue Gerard [Cochard]" such as to "[t]ake no prisoners and go after Gerard for a counterclaim." Tr. I at 74.  Mr. Mayer discussed with Mr. Glanz and Dr. Rothenberger "what we perceived we could go after him for." At this point, the hard drives from Warwick had not arrived in Atlanta, much less been examined for wrongdoing.[3]  *Id.* at 75.  Nevertheless, Mr. Mayer testified that coupled with its desire to "take no prisoners and go after Gerard," Roehm made an "assumption," based on "gut feeling," that the hard drives had been copied.  *Id.* Roehm ultimately filed a fourteen-count counterclaim though the gravamen is that Mr. Cochard misappropriated Roehm's "trade secrets," shared those "trade secrets"

---

[3] Roehm later hired Melvin Swain to conduct a forensic examination of the computers and external hard drives returned to Roehm.  Because Mr. Swain was not disclosed as an expert witness and did not submit an expert report, and because his proffered testimony was clearly expert opinion, the Court disallowed most of his testimony. The testimony he did provide offered nothing of substance to Roehm's case.

with competitors, and thus caused Roehm to suffer "severe and irreparable damages." (ECF No. 11 ¶ 48.)

It was not until twelve days before trial, and long after a court order directing them to do so, that Roehm specifically identified what items it considered "trade secrets." Roehm offered thirteen documents, admitted at trial as Exhibits 41-52 and 58, which were product drawings in PDF format.

At trial, Mr. Mayer, whom the Court found totally credible on this point, testified that the drawings at these exhibits were publicly available information; that is, they were the type of drawings "typically shar[ed] with customers." Tr. I at 109-16. Indeed, for Exhibits 47 and 48, Mr. Mayer testified that these were drawings of standard products right out of Roehm's catalogue and would be available to anyone with an internet connection. *Id.* at 109-11.

Mr. Jackson, the current CEO who had been on the job for nine or ten months prior to his trial testimony, could not say whether these exhibits were trade secrets. Tr. IV at 8. He did not know who had chosen these items to be the purported trade secrets out of the universe of documents because it was "before [his] time." *Id.* at 7. Indeed, he did not claim that the actual drawings introduced as Exhibits 41 to 52 and 58 *were* trade secrets. Instead, he seemed to claim that certain CAD drawings, not in evidence, could potentially be Roehm trade secrets depending on whether engineers in Germany had decided to release or withhold them pursuant to a mysterious written policy that Mr. Jackson had never seen, could not produce, and which was not produced by Roehm in discovery. *Id.* at 7-17. The Court finds this

testimony incredible, as it does for Mr. Jackson's testimony generally.

Mr. Jackson did state that Roehm protected its confidential business information using non-disclosure agreements, but none of the documents introduced at trial—including Exhibits 41 to 52 and 58—were associated with such agreements. *Id.* at 44.

Moreover, neither Mr. Mayer nor Mr. Jackson offered evidence that Mr. Cochard was in possession of any Roehm trade secret or identified a single company or individual to whom Mr. Cochard had disclosed any of Roehm's trade secrets.  Tr. IV at 9-10.

Further, Roehm offered no specific evidence on its alleged damages.  Mr. Jackson testified generally that Mr. Cochard's desire to harm the company or to "steal" from it is "taboo" in the manufacturing industry but then stated that any damages were "very difficult to quantify" and did not provide anything that could be used for a damages calculation.  Tr. III at 139-51.

**Mr. Cochard's Unpaid Commissions**

Mr. Cochard has made a claim for unpaid commission in the final months of his work at Roehm.  According to Mr. Mayer, Mr. Cochard's entire office worked really hard up until their final day and were taking orders nonstop until his arrival in Warwick to shut down the office.  Tr. I at 106.

Mr. Cochard rate of commissions was 0.3% on sales by the time his employment with Roehm ended.  Tr. III at 90.  Upon seeing his last paycheck, Mr. Cochard inquired of Roehm why it did not include his commission.  *Id.* at 89-90.  Mr.

Cochard learned that Mr. Mayer had directed the payroll administrator not to pay his commission. *Id.* at 90.

During this litigation, Mr. Cochard made a request for production seeking documents related to his commission compensation.[4]   Roehm responded to that request, and to all the others, with identical boilerplate objections.   Mr. Cochard therefore moved to compel (ECF No. 45), and the Magistrate Judge granted that motion in part, striking Roehm's objections without prejudice and ordering a response. *See* Text Order of 8/29/19.  Mr. Cochard's attorney has represented to the Court that Roehm never provided responsive information.  (ECF No. 103 at 17-18.)

Mr. Cochard therefore estimated the total figure of sales.  He initially testified on direct examination a range of $6 million to $8 million but on cross-examination he acknowledged he "misspoke" and changed his answer to conform to his pretrial deposition testimony where he testified the amount was in the range of $2 million to $3 million. Tr. III at 92, 97-98.  These figures would have earned him $6,000 to $9,000 in commission compensation.

Mr. Cochard was a credible witness, had 25 years of experience at Roehm and would generally be aware of the amount of sales in his final period.  This, combined with Mr. Mayer's testimony that there was no slowdown in sales despite Mr.

---

[4] Mr. Cochard requested:

> Any and all documents related to commission compensation payable to Mr. Cochard during the period March 16, 2018 to present, including but not limited to rules, regulations, memoranda, policies and procedures, payroll records, commission spreadsheets, ledgers, and/or accountings.

(ECF No. 45-1 at Request 34.)

Cochard's intent to leave the company, leads the Court to find Mr. Cochard's estimate of $2 million to $3 million as a fair one.

## II.   CONCLUSIONS OF LAW

As this matter is before the Court subject to diversity jurisdiction, 28 U.S.C. § 1332, the Court applies state substantive law. *Crellin Techs, Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 4 (1st Cir. 1994).

### A. Roehm's Counterclaims

Roehm's Counterclaims were the primary focus of the trial, and the Court will therefore consider them first.

Roehm advises in its post-trial memorandum that it is "not directly pursuing" the following counterclaims:

- Count III (tortious interference with contract)
- Count IV (tortious interference with prospective business relations)
- Count XI (conversion)
- Count XII (unjust enrichment)
- Count XIV (accounting)

The Court considers these counterclaims waived.

Roehm's Count V (breach of restrictive covenants) and Counts VIII – X (alleging computer crimes) were summarily adjudicated in Mr. Cochard's favor prior to trial. What remains are the following:

### 1. Violation of the Rhode Island Uniform Trade Secrets Act (Count I) and Punitive/Exemplary Damages Flowing From That Violation (Count II)

The Rhode Island Uniform Trade Secrets Act ("RIUTSA") defines a "trade secret" as follows:

(4) "Trade secret" means information, including a formula,

14

pattern, compilation, program, device, method, technique, or
process, that:
(i) Derives independent economic value, actual or potential, from
not being generally known to, and not being readily ascertainable
by proper means by, other persons who can obtain economic value
from its disclosure or use; and
(ii) Is the subject of efforts that are reasonable under the
circumstances to maintain its secrecy.

R.I.G.L § 6-41-1(4).

The Court concludes as a matter of law that the exhibits put forth as trade
secrets, 41-52 and 58, fail, completely, to qualify as trade secrets. Mr. Mayer credibly
testified that each of these exhibits would be shared with customers or, in the case of
exhibits 47 and 48, were standard catalogue products. As such, they were "readily
ascertainable by proper means" and not "the subject of efforts … to maintain [their]
secrecy." R.I.G.L. § 6-41-1(4)(i)-(ii); *see also APG, Inc. v. MCI Telecommunications
Corp.*, 436 F.3d 294, 307 (1st Cir. 2006) (holding that information is not a trade secret
under R.I.G.L. § 6-41-1 when it is information "obtainable within normal business
channels"). Further, Roehm presented no evidence that any of these exhibits was
ever subject to a non-disclosure agreement.

This ends any possibility of Roehm prevailing on its trade secrets claims. And
for the simple fact that it has not established the existence of any trade secrets,
Roehm cannot establish that Mr. Cochard *misappropriated* any trade secrets.[5] The

---

[5] R.I.G.L. § 6-41-1(2) defines "misappropriation" as:
(i) Acquisition of a trade secret of another by a person who knows or has reason to
know that the trade secret was acquired by improper means; or
(ii) Disclosure or use of a trade secret of another without express or implied consent
by a person who:
    (A) Used improper means to acquire knowledge of the trade secret; or

Court notes again that it finds credible Mr. Laren's testimony that he returned any copied files to Roehm because Mr. Cochard changed his mind and decided not to keep any Roehm files after leaving its employ. Moreover, Roehm presented no evidence that Mr. Cochard indeed has any of its files or disclosed any of that information to a third party. As such, Mr. Cochard did not misappropriate any trade secrets as a matter of law.

Roehm's Count II, for damages for violation of the RIUTSA, fails as a matter of law because there is no evidence of any trade secrets.

### 2. Breach of the Duty of Loyalty (Count VI) and Breach of Fiduciary Duty (Count VII)

Roehm states in its post-trial memorandum that its counterclaim for a breach of duty of loyalty (Count VI) is "subsumed into [the] breach of fiduciary duty" counterclaim (Count VII) and thus the Court considers these together as one claim under the law of fiduciary duty.[6] To prevail on a claim for a breach of fiduciary duty,

---

(B) At the time of disclosure or use, knew or had reason to know, that his or her knowledge of the trade secret was:
    (I) Derived from or through a person who had utilized improper means to acquire it;
    (II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
    (III) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
(C) Before a material change of his or her position, knew or had reason to know, that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

[6] Indeed, the Rhode Island Supreme Court has equated a fiduciary duty with a duty of loyalty. *In re Estate of Ross*, 131 A.3d 158, 167 (R.I. 2016) ("A fiduciary duty is a duty of loyalty; it is a special confidence reposed in one who in equity and good

a plaintiff must prove "(1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach." *Pope v. City of Providence*, No. PB-13-3634, 2014 WL 2134482, *3 (R.I. Super. Ct. May 15, 2014).

The Court concludes that as Vice President of Roehm, Mr. Cochard had a fiduciary relationship with the company. *See A. Teixeira & Co. v. Teixeira*, 699 A.3d 1383, 1386 (R.I. 1997). But that is the only element Roehm can establish. Mr. Cochard's plan to copy files from the Roehm server and use them to support his expected work with a competitor may have risen to the level of a breach of fiduciary duty if he actually carried it out but, as he testified credibly, he "decided against" this plan. Tr. III at 101. Instead, he directed Mr. Laren to return all copied files to Mr. Mayer, and that was done. The copying of files while he was in Roehm's employ, without disclosure to third parties, only to leave them with Roehm before that employment ended, simply does not equate to a breach of Mr. Cochard's fiduciary duty. Furthermore, Roehm has offered no evidence of quantifiable damages that could satisfy the third element of a claim of breach of fiduciary duty.

### 3. Writ of Replevin (Count XIII)

Roehm seeks a writ of replevin against Mr. Cochard compelling him to return Roehm's trade secrets. The Court concludes as a matter of law that Roehm cannot sustain its claim for a writ of replevin because it has not demonstrated that Mr. Cochard is in possession of any trade secrets, or any of Roehm's property for that

---

conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence.") (quoting 37 Am.Jur.2d *Fraud and Deceit* § 35 at 64 (2013)).

matter.  As noted above, the Court finds credible the testimony of Mr. Laren and Mr. Cochard that the files they copied from the Roehm server were returned to Roehm before their employment ended.

## B. Mr. Cochard's Claims

### 1. Unpaid Commissions

Mr. Cochard claims, under a breach of contract theory, that he is owed commissions on sales and Roehm has refused to pay.  Roehm does not dispute that it made no such payment.  Rhode Island law requires that "the amount of damages sustained from a breach of contract must be proven with a reasonable degree of certainty.  The plaintiff must establish reasonably precise figures and cannot rely upon speculation." *Sea Fare's Am. Café, Inc. v. Brick Mkt. Place Assocs.*, 787 A.2d 472, 478 (R.I. 2001) (internal citation omitted).  "However, '[p]laintiffs will not be denied recovery merely because the damages … are difficult to ascertain, as long as they prove damages with reasonable certainty.'" *Id.*

Roehm argues that Mr. Cochard has not met this burden and has relied only upon speculation.[7]  But there are two problems with this assertion.

---

[7] In its post-trial memorandum, Roehm also argues that it does not owe Mr. Cochard any commission because he breached his fiduciary duty to the company.  This defense cannot be sustained, of course, because the Court finds that Mr. Cochard did not breach his fiduciary duty.

The Court also notes that at trial, Roehm began to elicit testimony from Mr. Jackson that an employee would not be due a commission when he or she leaves the company in a period when a commission is to be calculated.  Tr. III at 144.  But the Court finds this testimony inconclusive with respect to Mr. Cochard.  Indeed, Roehm's counsel discontinued his questioning on this issue and turned to another topic when it was made apparent that assertions about whether Mr. Cochard's commission was owed would require payroll records that Roehm never produced.  *Id.* at 145-47.  In

First, as noted, the Court finds that a reasonable estimate of his sales earnings for the relevant period were between $2 and $3 million which would have earned him a $6,000 to $9,000 commission payment.  This is because the Court found Mr. Cochard credible, that after 25 years' experience he could be reasonably certain as to his sales totals in a given period, and Mr. Mayer's testimony that there was no slowdown in sales from Mr. Cochard's office leading up to his departure.  The Court therefore concludes that Mr. Cochard's damages estimate was made with reasonable certainty and was reasonably precise.  *See Sea Fare's Am. Café, Inc.*, 787 A.2d at 478.

Secondly, despite Mr. Cochard's discovery request, Roehm failed to provide documentation that could have established a more precise sales figure.  Roehm cannot now claim that Mr. Cochard's figure is not precise enough.  *See Eastman Kodak Co. v. So. Photo Materials Co.*, 273 U.S. 359, 379 (1927) ("[A] defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible.").

The Court concludes as a matter of law that Mr. Cochard has met his burden with respect to his claim for unpaid commissions.  The Court will award him $7,500 in compensatory damages—a figure between his $6,000 to $9,000 expected commission.

---

addition, Roehm has not pressed an argument that Mr. Cochard would not be due a compensation under company policy in its post-trial memorandum.

### 2.  Attorney's Fees Under the Rhode Island Uniform Trade Secrets Act

Mr. Cochard also seeks attorney's fees under the RIUTSA, which provides that if "a claim of misappropriation is made in bad faith … the court may award reasonable attorney's fees to the prevailing party."  R.I.G.L. § 6-41-4.

Roehm reacted to Mr. Cochard's resignation from the company to join a competitor with a false claim about a restrictive covenant.  Then, after he was forced to file a lawsuit to obtain a copy of the purported restrictive covenant, Roehm filed an incendiary series of counterclaims that included the trade secrets claims.  This was against a backdrop of Roehm's plan to "take no prisoners and go after [Mr. Cochard]," which the Court finds to be evidence of Roehm's decision to use the legal system to punish him.  Then, after years of litigation, when Roehm finally put its trade secrets cards on the table, it provided documents that had been available either simply by perusing its catalogue or to customers through normal business channels.  Roehm's witnesses either testified that this was so (Mr. Mayer) or could not credibly deny it (Mr. Jackson).  In short, Roehm, fueled by an intent to punish Mr. Cochard, knowingly proceeded with claims of trade secret misappropriation that had absolutely no basis.

The Court therefore can only conclude that Roehm brought its trade secrets claims in bad faith.  Mr. Cochard is thus awarded reasonable attorney's fees pursuant to § 6-41-4.  Because the trade secret claims are the only counterclaims that include a statutory award of attorney's fees, this award must be limited to services rendered in the defense of Counts I and II of Roehm's Counterclaim.

## III. CONCLUSION

In accordance with the above findings of fact and conclusions of law, the Court directs judgment to enter in favor of Mr. Cochard on all of Roehm's remaining counterclaims (Counts I, II, VI, VII, and XIII). In addition, judgment shall enter on Mr. Cochard's claim for unpaid commissions, with damages in the amount of $7,500. Rhode Island law requires prejudgment interest of 12% per annum on any monetary civil judgment, R.I.G.L. § 9-21-10(a), and so interest from June 1, 2018, to February 1, 2023, or 56%, shall be added for a total judgment of $11,700.

Mr. Cochard also is entitled to reasonable attorney's fees for his defense of Roehm's trade-secrets counterclaims (Counts I and II), which the Court finds were brought in bad faith. Mr. Cochard therefore may present a motion for attorney's fees pursuant to Fed. R. Civ. P. 54(d)(2) and LR Cv. 54.1.

Finally, as the prevailing party, Mr. Cochard is entitled to present a bill of costs pursuant to Fed. R. Civ. P. 54(d) and LR Cv. 54.

IT IS SO ORDERED/

_____
Mary S. McElroy
United States District Judge
February 1, 2023

21